Argued and submitted June 24, affirmed December 7, 1981,
reconsideration denied January 14,
petition for review denied March 2, 1982 (292 Or 589)

## The McINTYRE-COOPER CO.,
*Petitioner,*

*v.*

## BOARD OF COMMISSIONERS OF WASHINGTON COUNTY et al,
*Respondents.*

### (LUBA No. 80-099, CA 19925)

637 P2d 201

Kevin L. Hanway, Portland, argued the cause and filed the brief for petitioner.

Alan S. Bachman, Assistant County Counsel, Hillsboro, argued the cause and filed the brief for respondent Board of Commissioners of Washington County.

Frank Josselson, Portland, argued the cause for respondent Friends of 87th Avenue. With him on the brief was Lang, Klein, Wolf, Smith, Griffith & Hallmark, Portland.

Mark J. Greenfield, Portland, filed a brief amicus curiae for 1000 Friends of Oregon.

Before Gillette, Presiding Judge, and Roberts and Young, Judges.

ROBERTS, J.

**ROBERTS, J.**

This is an appeal from a final order of the Land Use Board of Appeals affirming Washington County's denial of petitioner's request for a zone change. We affirm.

Petitioner's property comprises 1.92 acres on Southwest 87th Avenue in unincorporated Washington County. The property is vacant and zoned for low density residential development. The Washington County Comprehensive Plan, adopted in 1973, prior to the enactment of the Land Conservation and Development Commission's (LCDC) statewide goals, designates petitioner's property as "high density residential." At the time of this proceeding, Washington County was in the process of drafting a new comprehensive plan to be submitted to LCDC for acknowledgement. Desiring to build townhouses on the land, petitioner submitted to respondent an application for a zone change to high density residential in October, 1979. Following a public hearing, the hearings officer denied the application. In doing so, he made the following findings:

"1. Plan and Development No. 17 designates the area urban high density residential. The Washington County Comprehensive Framework Plan designates the area urban.

"2. The present zoning on the site, RU-3 [Urban Low Density Residential] is in accord with the plan as is the request for an urban high density zoning designation. The site is located on Southwest 87th Avenue in the West Slope area. Southwest 87th Avenue extends northerly from Canyon Lane and dead-ends approximately 500 feet north of the site. There are no sidewalks or curbs along Southwest 87th Avenue north of Canyon Lane. The proposed site is surrounded by residences. The houses fronting on Southwest 87th Avenue are older residences, generally well-maintained with medium to large-sized lots, heavily covered with shrubs and trees. Approximately one-tenth of a mile to the south of the site on Southwest 87th Avenue is a 32-unit apartment complex. Since Southwest 87th Avenue is a deadend at the north, the residents of this apartment complex do not pass the site or the houses surrounding the site on their way to or from the apartment complex.

"4.[sic]  The additional traffic generated by the proposed project will create a hazard to pedestrians and children using the street to ride their bicycles. In addition, the traffic

would disrupt the tranquillity and privacy of those homes that abut Southwest 87th Avenue between the site and Canyon Lane.

"5.[sic]    The proposed development would introduce a housing type not currently existing in the immediate neighborhood.

"6.[sic]    There is a natural stream which crosses the property, flowing generally from the northeast to southwest. The natural channel on the site east of Southwest 87th Avenue is several times larger in cross section than the man-made channel west of southwest 87 Avenue. On several occasions, the yards of the houses to the west of Southwest 87th Avenue have been flooded by the stream. Development of the site would probably contribute to flooding west of Southwest 87th Avenue.

"7.[sic]    The intersection of Canyon Lane and Southwest 87th Avenue has been the scene of numerous accidents.

"8.[sic]    In the general vicinity of the site there are several large apartment complexes, all of which front along Canyon Lane, other than the one mentioned above, and a number of commercial and retail establishments in the West Slope Shopping Center. The neighborhood located on Southwest 87th Avenue, however, is effectively cut off from these commerical enterprises and high density residential development with the one exception of the apartment located on the south end of 87th Avenue. As a result, the Southwest 87th Avenue neighborhood has the privacy, tranquillity and natural beauty of a semi-rural area, even though it is located less than one-tenth of a mile from high density residential and commercial uses."

Petitioner does not challenge these findings. The hearings officer concluded that the proposed development would change the character of the neighborhood and that petitioner had failed to meet its burden of proof to show why such a change would be in the public interest. Petitioner had also, he said, failed to address adequately the flooding problems its development might cause.

Petitioner appealed to the Board of County Commissioners, which affirmed the hearings officer and adopted his findings. Petitioner then appealed to the Land Use Board of Appeals, assigning as errors: (1) the county's application of a "preserving the neighborhood character" standard in

violation of LCDC Statewide Goal 10 (Housing); and (2) basing the denial in part on flooding problems, petitioner contending the county's comprehensive plan made flooding a matter to be considered in design review, not at the time of a zone change request. LCDC, pursuant to Or Laws 1979, ch 772, § 5 (4)(b), approved LUBA's recommendation with respect to the alleged goal violation and issued its determination that no goal violation had occurred. LUBA then issued its final order affirming the denial of the zone change request on December 18, 1980. The order held that Goal 10 did not apply until "a need has been shown for housing within an urban growth boundary at particular price ranges and rent levels." Because Washington County was in the process of compiling its housing inventory, as part of the process of drawing up its proposed comprehensive plan, no specific need for any particular type of housing had yet been demonstrated as part of the planning process. The decision held that petitioner had to show the need for the type of housing it proposed and it had not met that burden. Petitioner and amicus curiae 1000 Friends of Oregon urge that this was improper.

Petitioner's argument is centered on the relationship between LCDC's Goal 10, Housing, and the Washington County comprehensive plan policy, which sets forth preservation of neighborhood character as a goal. Goal 10 states:

> "Goal: To provide for the housing needs of the citizens of the state. Buildable lands for residential use shall be inventoried and plans shall encourage the availability of adequate numbers of housing units at price ranges and rent levels which are commensurate with the financial capabilities of Oregon households and allow for flexibility of housing location, type and density."

LCDC has interpreted Goal 10 in a Housing Policy statement (often referred to as the "St. Helens' Policy") as follows:

> "Where a need has been shown for housing within an urban growth boundary at particular price ranges and rent levels, housing types determined to meet that need shall be permitted in a zone or zones with sufficient buildable land to satisfy that need. This policy shall not be construed as an infringement on a community's prerogative to 1) set approval standards under which a particular housing type is

permitted outright, 2) impose special conditions upon approval of a specific development proposal, or 3) establish approval procedures. However, approval standards, special conditions, and the procedures applicable to both 1) must be clear and objective and 2) must not have the effect, either of themselves or cumulatively, of discouraging, such as through unreasonable cost or delay, the needed housing type."

Petitioner contends that this policy is violated by the section of the Washington County Comprehensive Framework Plan quoted by the hearings officer in his conclusions. This portion of the county's plan policy states:

"In delineating densities on a community basis, the following must be considered: to provide for a variety of living environments within a community, but to insure each neighborhood has a specific character and that character is preserved."

■ Goal 10 mandates the action to be taken by a planning body in drawing up its comprehensive plan ("Buildable lands for residential use shall be inventoried * * *") and the content of that plan ("* * * plans shall encourage the availability of adequate numbers of housing units, * * *"). The language "Where a need has been shown for housing within an urban growth boundary at particular price ranges and rent levels, * * *" refers to situations in which a particular housing need has been identified in a comprehensive plan and means two things: that specific housing needs are to be identified as part of that plan and that standards for approving development to meet those needs must be clear and objective.

■ LUBA did not shift to petitioner the burden for completing the county's housing needs inventory; it only stated the obvious: that the housing needs have not yet been established. Until the county has an acknowledged comprehensive plan, Washington County land use actions are controlled by the existing 1973 plan and the statewide planning goals. *Sunnyside Neighborhood v. Clackamas Co. Comm.*, 280 Or 3, 569 P2d 1063 (1977); *Willamette University v. LCDC*, 45 Or App 355, 608 P2d 1178 (1980). The 1973 plan places the burden on a petitioner for a zone change to show a public need for the rezoning and whether that need is best served by changing the zoning classification of the

property in question. LCDC found that, in denying petitioner's request, the county did not violate Goal 10 by applying the "neighborhood preservation" standard.[1] Petitioner does not challenge the evidentiary basis for LUBA's order.

■     Petitioner's second assignment of error is that denial of the requested zone change on the basis of potential flooding problems violates the county's comprehensive plan and its zoning ordinances. Petitioner contends that drainage is a matter for review at the design review stage of the project and not at the initial zoning approval stage. LUBA disposed of this contention by concluding that flooding was properly considered as an issue relevant to whether the proposed development would be in harmony with the neighborhood. LUBA's ruling was proper, although perhaps wrongly reasoned. Petitioner is correct that certain design and location characteristics of a development's drainage plan are required by the county's plan to be considered during the design review process. The Washington County Comprehensive Framework Plan provides:

"The following criteria will be used in the design review process:

"*Project Development*

"The proposal will be reviewed to insure it will

"* * * * *

"b.     Provide a safe, pleasing and liveable environment for those people utilizing the development, and immediate neighbors or community as a whole.

"* * * * *

"*Aesthetic Design*

"It will minimize or eliminate adverse visual effects which might otherwise result from unplanned or inappropriate development, design or juxtaposition. Such adverse effects may include, but are not limited to those produced by the design and locational characteristics of:

"* * * * *

"b.     Surface and subsurface drainage and appurtenant structures;

"* * * * *."

---

[1] It is important to bear in mind that LCDC found only that the county's standard, in a pre-acknowledgement situation, did not violate Goal 10. Petitioner has cited to us LCDC orders which indicate LCDC might rule otherwise in an acknowledgement or post-acknowledgement situation when need has already been established.

However, the section of the plan immediately preceding the design review criteria includes a list of policies intended to guide "community design," among them these:

"* * * * *

"Residential areas will be developed to varying densities contingent upon the topographic soil and drainage conditions, the type of development, location, and available public services such as sewer and water.

"Residential densities will be decreased or prohibited where problems of drainage, slumping and sliding, erosion, and accessibility are encountered, due to topographic conditions.

"* * * * * "

These policies, particularly when considered in context with others in the list,[2] are clearly intended for consideration in "design" of the overall community, i.e., the planning and zoning process itself, rather than in the design of any one specific project. LUBA was therefore correct that drainage problems were properly considered by the county in denying petitioner's zoning change.

Affirmed.

---

[2] Other community design policies, for instance, are:

"Residential areas should be located convenient to work, shopping and recreational areas, and near thoroughfares and transit lines, in order to provide good transportation connections.

"* * * * *

"The greatest residential densities will be allowed in those residential portions of the community best served by the transportation system, with densities decreasing as distances increase from major highways and (in the future) mass transportation routes.

"* * * * *

"Open space and low-density land uses will be located surrounding communities to prevent continuous urbanization and pollution of the land."